IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CT-3115-D

| | | |
|---|---|---|
| JONATHAN POSNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| LT. DAY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

On April 23, 2019, Jonathan Posner ("Posner" or "plaintiff"), then a state pretrial detainee proceeding pro se and in forma pauperis, [D.E. 2, 9], filed a complaint under 42 U.S.C. § 1983 [D.E. 1]. On December 11, 2019, the court reviewed Posner's filings, dismissed one defendant, and allowed the action to proceed [D.E. 16].

On March 13 and 21, 2020, defendants moved for summary judgment [D.E. 33, 42]. The court notified Posner of the motions for summary judgment, the consequences of failing to respond, and the response deadlines [D.E. 39, 46]. See Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam). Posner objected and filed numerous motions for discovery and appointment of counsel [D.E. 40, 48, 49, 52, 58, 59]. On October 20, 2020, the court granted Posner's motions under Rule 56(d) and directed defendant to produce a complete copy of his medical records from January 19, 2018, until the date of his transfer into state custody [D.E. 67]. The court also gave Posner until December 4, 2020, to respond to defendants' motions for summary judgment. See id. On November 30, 2020, Posner responded in opposition to the motions for summary judgment [D.E. 71]. As explained below, the court grants defendants' motions for summary judgment.

I.

The allegations of Posner's complaint arose at the Franklin County Detention Center ("FCDC" or "jail"). On January 19, 2018, at approximately 4:40 p.m., Christopher Alston ("Alston"), an inmate at FCDC, assaulted Posner, resulting in serious injuries to his nose and eyes. See Am. Compl. [D.E. 13] 2–3; see Thompson Decl., Ex. A [D.E. 44-7] 11. Immediately after the assault, two correctional officers took Posner to the medical department where a nurse who is not a defendant examined Posner and gave him ice and two Motrin pills for pain. See Sumpter Aff. [D.E. 36-1] ¶ 12 & Ex. 1 [D.E. 37] 12; Day Decl. [D.E. 44-3] ¶ 11; Thompson Decl. [D.E. 44-7] ¶ 10; cf. Am. Compl. at 4–5. Moreover, Tameka Sumpter ("Sumpter"), a nurse at FCDC who had just finished her work shift, "entered a verbal order from [the jail physician] for an x-ray for Mr. Posner." Sumpter Aff. [D.E. 36-1] ¶ 13 & Ex. 1 [D.E. 37] 23. "The mobile on-site imaging and diagnostic service came to the [j]ail and took an x-ray of Mr. Posner's face on that same day," which indicated "a minimally displaced fracture of the nasal bones at the base of the nasal bones." Sumpter Aff. [D.E. 36-1] ¶ 13 & Ex. 1 [D.E. 37] 24–25; cf. Am. Compl. at 6; Philbeck Decl., Ex. G [D.E. 44-2] 38.

Posner initially reported that he sustained the injuries because he fell in his cell. See Day Decl. [D.E. 44-3] ¶ 11; Thompson Decl. [D.E. 44-7] ¶ 10; Wilson Decl. [D.E. 44-8] ¶ 13. After reviewing footage from the cellblock and asking some of the other inmates what had happened, defendant Travis Day ("Day"), a jail lieutenant, came to the nurses' station to ask Posner about the incident. See Day Decl. [D.E. 44-3] ¶¶ 12–13 & Ex. A [D.E. 44-3] 14 (incident report); Wilson Decl. [D.E. 44-8] ¶ 13; cf. Am. Compl. at 5. Posner "complained of feeling dizzy and appeared/felt like he either passed out or was having convulsions." Am. Compl. at 5; cf. Day Decl. [D.E. 44-3] ¶ 13 (Posner "appeared to be shaking a bit and was slumped in the chair, but was otherwise

2

conscious and breathing"). Although Posner continued to deny that he had been assaulted, Day did not believe him. See Day Decl., Ex. A [D.E. 44-3] 14. After the conversation, Day "informed the officers that, once the nurse was done treating Mr. Posner, that he would need to be housed in Cell A71, which is a padded cell that is easily accessible by detention officers and medical staff, where inmates are checked on every 15 to 30 minutes." Day Decl. [D.E. 44-3] ¶ 15 & Ex. A [D.E. 44-3]; cf. Am. Compl. at 5. Posner alleges that Day stated that Posner was "'faking a seizure[,]'" Am. Compl. at 5. Day denies that he made that statement. See Day Decl. [D.E. 44-3] ¶ 16. Rather, Day states that he ordered Posner's cell placement "to help prevent [Posner] from falling or causing anymore injuries and to keep a close eye on inmate Posner if his condition was to worsen." Day Decl., Ex. A [D.E. 44-3] 14–15; see Bartholomew Decl. [D.E. 44-5] ¶ 7; Howard Decl. [D.E. 44-6] ¶ 9; Thompson Decl. [D.E. 44-7] 19; cf. Philbeck Decl., Ex. G [D.E. 44-2] 38–39 (cell observation log indicating that Posner was placed in the cell for "special observation" rather than for "suicide prevention"). Day did not charge Posner with of disciplinary infraction, including for faking a seizure. Cf. Philbeck Decl., Ex. C [D.E. 44-2] 26–27 (February 8, 2019 disciplinary report placing Posner in "E Dorm on indefinite[] restriction" for possessing a syringe, a "container with what smelled like alcohol," and other contraband).[1]

Posner alleges that the "pit toilet" in the padded cell was unsanitary. Am. Compl. at 6; cf. Philbeck Decl., Ex. L [D.E. 44-2] 77 (photograph of flushing mechanism for the toilet in the cell). Posner alleges that he "did not sleep that night due to discomfort from pressure and pain in his head."

---

[1] Once Posner acknowledged that he had been assaulted and identified Alston as his assailant, detention officers took Alston to a different housing unit and placed Alston on lockdown. See Thompson Decl. [D.E. 44-7] ¶ 12 & Ex. A [D.E. 44-7] 10. Ultimately, Alston was criminally charged and convicted of assaulting Posner. See Philbeck Decl., Ex. D [D.E. 44-2] 32–34; Am. Compl. at 8.

3

Am. Compl. at 6; cf. Philbeck Decl., Ex. G [D.E. 44-2] 38–39 (overnight observation log indicating that Posner was laying down but not sleeping). Posner also alleges that Day denied him "reasonable access to basic hygiene materials such as soap, a toothbrush, toothpaste, water to keep injuries clean, . . . and clean clothing for a period of four days" following the assault. Am. Compl. at 28. There was a sink in the padded cell, and jail records indicate that Posner took a shower at 9:15 p.m. on January 21, 2018. See Philbeck Decl., Exs. G [D.E. 44-2] 46. Detention officers who are trained in "the detection of signs and symptoms that may suggest a medical emergency" checked on Posner every 15 minutes. Bartholomew Decl. [D.E. 44-5] ¶¶ 4, 9; see Philbeck Decl., Ex. G [D.E. 44-2] 38–46; Howard Decl. [D.E. 44-6] ¶¶ 4, 11; Thompson Decl. [D.E. 44-7] ¶¶ 4, 21.

Over the next two days a nurse who is not a defendant observed that Posner's left eye was still swollen, and directed "Posner to let medical staff or detention officers know of any changes." Sumpter Aff. [D.E. 36-1] ¶ 15 & Ex. 1 [D.E. 37] 12; cf. Am. Compl. at 6. Posner continued to receive Motrin and bags of ice for pain and swelling. See Am. Compl. at 7–8. On January 22, 2018, after a second x-ray reflected "that a fracture in the mid zygomatic arch was suspected" and "that a CT scan may be helpful[,]" Sumpter "transmitted a Patient Outside Referral Information Form to Maria Parham Health Hospital, requesting a CT scan for Mr. Posner." Sumpter Aff. [D.E. 36-1] ¶¶ 16–17 & Ex. 1 [D.E. 37] 28, 30–31; cf. Am. Compl. at 8–9. On the same day, "Posner received the CT scan, which showed a mildly comminuted fracture of the nasal bones, and fractures of the medial wall and floor of the left orbital inferior rim of the left orbit (or eye socket)." Sumpter Aff. [D.E. 36-1] ¶ 18 & Ex. 1 [D.E. 37] 32–37; see Am. Compl. at 8–9. The hospital released Posner that same day, and he returned to the jail where officers assigned him to "a regular cell." Am. Compl. at 9; see Sumpter Aff. [D.E. 36-1] ¶ 18 & Ex. 1 [D.E. 37] 36.

On January 25, 2018, the jail physician, who is not a defendant, examined Posner and

4

"ordered for Mr. Posner to be seen and evaluated by an otolaryngologist ('ENT')." Sumpter Aff. [D.E. 36-1] ¶ 19 & Ex. 1 [D.E. 37] 10, 13. On January 27, 2018, a nurse who is not a defendant examined Posner in response to complaints "of visual disturbances in his left eye, stating that he was seeing large black spots which were getting worse." Sumpter Aff. [D.E. 36-1] ¶ 20 & Ex. 1 [D.E. 37] 14. On January 30, 2018, an outside ENT examined Posner and diagnosed him with a significantly displaced nasal and septal fracture requiring surgery and ordered an eye exam. See Am. Compl. at 10; Sumpter Aff. [D.E. 36-1] ¶ 21 & Ex. 1 [D.E. 37] 38. On January 31, 2018, an outside optometrist examined Posner, "diagnosed Mr. Posner with retinal hemorrhage and compression of the optic nerve in his left eye[,]" and "recommended that Mr. Posner's left eye and orbital fracture be monitored in the meantime, as orbital surgery could increase his risks substantially." Sumpter Aff. [D.E. 36-1] ¶ 22 & Ex. 1 [D.E. 37] 43–44; see Am. Compl. at 10.

On February 2, 2018, Posner "had reconstruction surgery for his nose . . . by Doctor Goldstein at the hospital in Henderson." Am. Compl. at 11; see Sumpter Aff. [D.E. 36-1] ¶ 23 & Ex. 1 [D.E. 37] 40. Posner returned to FCDC that same day, where he remained on medical watch until February 4, 2018. See Sumpter Aff. [D.E. 36-1] ¶¶ 23–26 & Ex. 1 [D.E. 37] 14–15, 39. Sumpter "checked on Mr. Posner multiple times throughout the afternoon of February 2, 2018, after he returned from surgery." Sumpter Aff. [D.E. 36-1] ¶ 24 & Ex. 1 [D.E. 37] 14. Upon his return to the FCDC, Posner received ibuprofen which Posner claims "didn't help" his pain. See Am. Compl. at 11. However, when Sumpter evaluated Posner on February 4, 2018, Posner denied having any pain. See Sumpter Aff, Ex. 1 [D.E. 37] 15. On February 4, 2018, Sumpter released Posner from medical watch with a standing order for ibuprofen. See Sumpter Aff. [D.E. 36-1] ¶ 26.

"On February 13, 2018, Mr. Posner attended a second follow-up appointment with the ENT, to remove the splints from his nasal cavities. Mr. Posner was cleared from further treatment by the

5

ENT, and no further appointments were to be scheduled unless needed. " Sumpter Aff. [D.E. 36-1] ¶ 27 & Ex. 1 [D.E. 37] 15, 50. Posner alleges that this appointment should have been several days earlier but when he asked Sumpter about it she replied "'I don't know anything about an appointment.'" Am. Compl. at 11–12.

On February 15 and March 8, 2018, two ophthalmologists examined Posner in response to Posner's continued complaints of pain and blurry vision and recommended referral to an oculoplastic surgeon for evaluation. See Am. Compl. at 13; Sumpter Aff. [D.E. 36-1] ¶¶ 28, 30 & Ex. 1 [D.E. 37] 15, 45–49, 51; Philbeck Decl., Ex. B [D.E. 44-2] 18. Both ophthalmologists sent letters to the jail urging the referral. See Am. Compl. at 21; Sumpter Aff., Ex. 1 [D.E. 37] 48. On March 28, 2018, Dr. Wrozsek, "an ophthalmologist specializing in oculoplastics," examined Posner, found that his vision had improved, and recommended monitoring and a vision test rather than surgery. Sumpter Aff. [D.E. 36-1] ¶¶ 33–34 & Ex. 1 [D.E. 37] 17, 52–55; cf. Am. Compl. at 22. Posner continued to receive regular examinations from Dr. Wrozsek, who found that Posner's condition was stable and warranted monitoring rather than surgery. See Sumpter Aff. [D.E. 36-1] ¶¶ 36, 40–41 & Ex. 1 [D.E. 37] 57–60, 63–65. Posner alleges that his vision continues to decline. See Am. Compl. at 22–24.

"Mr. Posner never submitted any Sick Call slips to medical from the date of his injury on January 19, 2018, through the end of 2018[,]" but continued to receive medical care related to the assault. Sumpter Aff. [D.E. 36-1] ¶ 38; see Arrington Decl. [D.E. 44-4] ¶ 10. On March 16, 2018, "Posner was called to the medical office to discuss his vision, and to discuss sending him to medical safekeeping at Central Prison." Sumpter Aff. [D.E. 36-1] ¶ 31 & Ex. 1 [D.E. 37] 16. Posner acknowledged that "he had been discussing his vision issues with the doctors at his eye care appointments, but had not disclosed any issue with medical staff at the [j]ail." Sumpter Aff. [D.E.

6

36-1] ¶ 31. Posner requested ibuprofen, but "refused to state that he had any medical issues at the time of this meeting, and therefore the [j]ail was unable to send him to medical safekeeping due to his lack of complaint of ongoing medical issues." Id.

Posner alleges that there is a documented history of inmate assaults at the FCDC, where "[a]t most times the jail is overcrowded and inadequat[e]ly monitored by jailers due to understaffing [of] officers" and "cell doors are jam[m]ed open creating known blind spots from cameras as well as officers in the control booth." Am. Compl. at 29. At the time of the assault, the jail had assigned Posner to Cell Block C ("C-Dorm" or "C-Block"), "an area which is for the general population, and it is a minimum security area." Winstead Decl. [D.E. 44-1] ¶ 12; see Day Decl. [D.E. 44-3] ¶ 8. However, the C-Dorm cell doors

> are not meant to be closed or locked. C-Dorm is meant to be an open environment for all inmates, and it would not be acceptable to lock some inmates in the individual cells while allowing others to freely roam C-Dorm . . . . Thus, the doors to the individual cells remain open and unlocked throughout the day, and inmates can enter the individual cells if desired.

Winstead Decl. [D.E. 44-1] ¶ 12; see Day Decl. [D.E. 44-3] ¶ 9; Thompson Decl. [D.E. 44-7] ¶ 8; Wilson Decl. [D.E. 44-8] ¶ 9.

"Inmates in C-Dorm are under constant monitoring and surveillance by several cameras and detention officers at FCDC, . . . . [who] make multiple security rounds at C-Dorm, at least twice per hour." Day Decl. [D.E. 44-3] ¶ 8; see Winstead Decl. [D.E. 44-1] ¶ 12. Thompson [D.E. 44-7] ¶ 7. Additionally,

> there are multiple methods through which inmates can communicate issues and provide pertinent information to detention officers that would allow them to prevent situations from arising. These communication methods include multiple intercoms in every cell block, including C-Dorm, through which inmates can directly communicate to detention officers; kiosks in dorms through which inmates can discretely email detention officers about issues that arise or safety concerns; phones that inmates can use to directly contact detention officers at all hours of the day; and

7

> written forms that can be submitted to FCDC staff. Inmates are informed that their communications are confidential and handled privately and discretely, so that they can be encouraged to bring matters to the attention of . . . officers without fear of how other inmates may react.

Winstead Decl. [D.E. 44-1] ¶ 7; see Day Decl. [D.E. 44-3] ¶ 24.

Posner did not alert any defendant or FCDC staff member "of any security concerns whatsoever" before the assault. Winstead Decl. [D.E. 44-1] ¶ 13; see Day Decl. [D.E. 44-3] ¶ 24; Arrington Decl. [D.E. 44-4] ¶ 8; Bartholomew Decl. [D.E. 44-5] ¶ 6; Howard Decl. [D.E. 44-6] ¶ 6; Thompson Decl. [D.E. 44-7] ¶ 15; Wilson Decl. [D.E. 44-8] ¶ 18. "Additionally, there were no documented Grievances, Incident Reports, or other documents in possession of FCDC prior to the January 19, 2018[] incident that would indicate to [defendants or FCDC staff members] that Mr. Posner was at risk of harm or would provoke harm, or that Mr. Alston would assault another inmate." Winstead Decl. [D.E. 44-1] ¶ 13; see Day Decl. [D.E. 44-3] ¶ 26. Moreover, before

> being placed in C-Block, Mr. Posner was in an individual cell, and he persistently asked [Day] to be let back into general population. He represented to [Day] that he strongly desired to be placed in general population, that he did not have any personal disputes with any of the other inmates, that there was no risk to placing him in general population, and that there was no reason that he should not be placed in general population, such as C-Dorm.

Day Decl. [D.E. 44-3] ¶ 25.

Posner asserts four claims: (1) a claim of cruel and unusual punishment in violation of the Fourteenth Amendment against Day "by keeping plaintiff in a padded cell / strip cell directly after plaintiff was seriously assaulted as a form of punishment" (count one); (2) a Fourteenth Amendment claim against Day for "depriving plaintiff reasonable access to basic personal hygiene materials . . . and clean clothing for a period of four days for punishment for 'faking a seizure'" following the assault (count two); (3) a Fourteenth Amendment claim against Winstead for failure to protect him from the assault (count three); and (4) a Fourteenth Amendment claim for deliberate indifference to

8

a serious medical need against all defendants (count four). See Am. Compl. at 27–32. Posner seeks declaratory relief, compensatory damages, and punitive damages. See id. at 32–34.

II.

Summary judgment is appropriate when the record as a whole reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323–25 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott, 550 U.S. at 378. "A party opposing a properly supported motion for summary judgment may not rest upon mere allegations [in his complaint], but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (quotations omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249–50 (citations omitted).

Courts evaluate confinement conditions of pretrial detainees under the Due Process Clause of the Fourteenth Amendment, rather than under the Eighth Amendment. See, e.g., Kingsley v. Hendrickson, 576 U.S. 389, 400 (2015); Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). As a

9

practical matter, the Due Process Clause analysis is materially indistinguishable from the Eighth Amendment analysis. See, e.g., Brown v. Harris, 240 F.3d 383, 388–89 (4th Cir. 2001); Riley v. Dorton, 115 F.3d 1159, 1166–67 (4th Cir. 1997) (en banc), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); Hill v. Nicodemus, 979 F.2d 987, 990–92 (4th Cir. 1992). Thus, to state a prima facie case that pretrial confinement conditions violate the Due Process Clause, "a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quotation omitted); see Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). "[T]he first showing requires the court to determine whether the deprivation of the basic human need was objectively sufficiently serious . . . ." Strickler, 989 F.2d at 1379 (emphasis and quotation omitted). The second showing "requires [the court] to determine whether subjectively the officials acted with a sufficiently culpable state of mind." Id. (emphasis, alteration, and quotation omitted).

To satisfy the subjective prong, a plaintiff must prove that the official acted with deliberate indifference. See, e.g., Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998); Strickler, 989 F.2d at 1379.[2] "While . . . deliberate indifference entails something more than mere negligence, . . . it is

---

[2] In Kingsley, the Supreme Court held that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." 576 U.S. at 397. The Second, Seventh, and Ninth Circuits "have viewed Kingsley's holding as establishing that an objective inquiry applies to a variety of conditions-of-confinement claims, not just those involving excessive force." Hardeman v. Curran, 933 F.3d 816, 823 (7th Cir. 2019) (collecting cases). "The Eighth, [Tenth,] Eleventh, and Fifth Circuits have chosen to confine Kingsley to its facts—that is, to Fourteenth-Amendment claims based on excessive-force allegations in a pretrial setting." Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018) (collecting cases); see Hooks v. Atoki, 983 F.3d 1193, 1203 (10th Cir. 2020). The Fourth and Sixth Circuits have not yet applied the holding in Kingsley to claims other than for excessive force. See Martin v. Warren Cty., Ky., 799 F. App'x 329, 338 n.4 (6th Cir. 2020); Shover v. Chestnut, 798 F. App'x 760, 761–62 (4th Cir. 2020) (per curiam) (unpublished); Dilworth v. Adams, 841 F.3d 246, 255 (4th Cir. 2016); Beale v. Madigan, 668 F. App'x 448, 449 (4th Cir. 2016)

satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). An official acts with deliberate indifference when he actually knows of and disregards "an objectively serious condition, medical need, or risk of harm." Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997); see Farmer, 511 U.S. at 837–38; Estelle v. Gamble, 429 U.S. 97, 104–05 (1976).

As for Posner's claim that Day placed him in an observation cell as punishment, "it is settled that pretrial detainees possess a constitutional right 'to be free from punishment.'" Williamson v. Stirling, 912 F.3d 154, 173 (4th Cir. 2018) (quoting and citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)). But "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." Bell, 441 U.S. at 537. Absent an expressed intent to punish a detainee, this determination "generally will turn on whether an alternative purpose to which the restriction may rationally be connected," and whether the restriction appears excessive based on the alternate purpose supporting it. Id.; see Williamson, 912 F.3d at 178.

Alston assaulted and seriously injured Posner. Day then assigned Posner to a cell where he received constant monitoring. Even viewing the record in the light most favorable to Posner, no rational jury could find that Day's decision to assign Posner to the cell for a period of two days was to punish Posner. Cf. Williamson, 912 F.3d at 180; Dilworth, 841 F.3d at 252–53. Thus, the claim fails.

As for Posner's claim concerning the conditions of confinement in the padded cell, jail officials violate the Fourteenth Amendment when they are deliberately indifferent to adverse

---

(per curiam) (unpublished); Duff v. Potter, 665 F. App'x 242, 244 (4th Cir. 2016) (per curiam) (unpublished); Hodges v. Massey, No. 1:19-CV-00137-MR, 2021 WL 54021, at *9 n.12 (W.D.N.C. Jan. 6, 2021) (unpublished).

11

conditions that deny "the minimal civilized measure of life's necessities." Budd v. Motley, 711 F.3d 840, 842 (7th Cir. 2013). To succeed on his claim, Posner "must clear a 'high bar' by demonstrating 'extreme deprivations.'" Ellis v. Pierce Cnty, 415 F. App'x 215, 217 (11th Cir. 2011) (per curiam) (unpublished). Moreover, the court must view the conditions of which Posner complains in their totality. See, e.g., Wilson v. Seiter, 501 U.S. 294, 304 (1991); Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991).

Even viewing the record in the light most favorable to Posner, Posner has failed to raise a genuine issue of material fact concerning the conditions in the padded cell. See, e.g., Jacobs v. Georgia, 820 F. App'x 882, 886–87 (11th Cir. 2020); Gee v. Pacheco, 627 F.3d 1178, 1192 (10th Cir. 2010); Webb v. Bucholtz, No. 1:20-CV-1036, 2021 WL 804721, at *5 (W.D. Mich. Mar. 3, 2021) (unpublished); Boyd v. Holmes, No. 5:18-CT-3277-BO, 2020 WL 630445, at *4 (E.D.N.C. Feb. 10, 2020) (unpublished) (citing Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997)); Hill v. Palmer, No. 1:18-CV-294-FDW, 2019 WL 937333, at *4 (W.D.N.C. Feb. 26, 2019) (unpublished). Thus, the claim fails.

As for Posner's failure-to-protect claim, "jail officials . . . must take reasonable measures to guarantee the safety of the inmates." Farmer, 511 U.S. at 832–33 (quotation omitted). A jail official will not be liable for a failure to protect a pretrial detainee "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Moreover, a jail official's failure to alleviate a significant risk of harm to an inmate that the official "should have perceived but did not" does not violate due process. Id. at 838.

Even viewing the record in the light most favorable to Posner, Posner has failed to

12

demonstrate a genuine issue of material fact as to whether any defendant was deliberately indifferent to his safety. To the contrary, the record demonstrates that defendants took numerous measures to ensure the safety of all FCDC inmates, including Posner. Whatever threat Posner perceived to his own safety before Alston's January 19, 2018 assault, the record fails to demonstrate that any defendant was aware that Alston (or any other inmate) posed a risk to Posner's safety. Accordingly, the claim fails.

Finally, Posner asserts a Fourteenth Amendment claim for deliberate indifference to his serious medical needs. Even viewing the record in the light most favorable to Posner, Posner has failed to demonstrate a genuine issue of material fact concerning whether any defendant was deliberately indifferent to his serious medical needs. To the contrary, the medical records demonstrate that Posner received proper medical care in response to his serious medical needs. To the extent Posner believes that his serious medical needs required earlier or different treatment than he received, or relies on conflicting recommendations by medical professionals, Posner's dispute constitutes a difference of opinion as to the proper course of medical treatment and fails to raise a genuine issue of material fact under the Fourteenth Amendment. See, e.g., Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam). Thus, the claim fails, and the court grants defendants' motions for summary judgment.

III.

In sum, the court GRANTS defendants' motions for summary judgment [D.E. 33, 42]. The clerk shall close the case.

SO ORDERED. This 16 day of March 2021.

JAMES C. DEVER III
United States District Judge

13